UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CAMERON BELK, SR., <br><br> Plaintiff, <br><br> v. <br><br> ARAMARK CORRECTIONAL SERVICES, LLC, MICHAEL BUJNAK, SHAN COLLINS, RHONDA DUBOSE, TAMMY GRIME, DEBORAH HALE, DENNIS P. LARSON, JANICE MCCARRON, DELANCEY MOORE, MELODY MURRY, MARY ROBINSON-DAVIS, RICHARD WATSON, and WEXFORD HEALTH CARE SOURCES, INC., <br><br> Defendants. | Case No. 19-cv-499-JPG |

## **MEMORANDUM AND ORDER**

This matter comes before the Court on two motions for summary judgment. The first was filed by defendant Shan Collins (Doc. 276), and plaintiff Cameron Belk, Sr. has responded to that motion (Docs. 284, 285 & 291). The second was filed by defendant Dennis P. Larson (Doc. 277, 278 & 279), and Belk has responded to that motion as well (Docs. 286, 278, 288, 289, 290 & 291). The claims for which summary judgment is sought are the only remaining claims in this case—Counts 2 and 3.

Belk filed this civil rights action *pro se* pursuant to 42 U.S.C. § 1983 complaining of his conditions of confinement while he was a detainee at the St. Clair County Jail ("Jail") beginning February 8, 2019. In Count 2 of his Third Amended Complaint, filed by assigned counsel currently representing Belk, Belk alleges that Dr. Larson, a doctor working at the Jail, refused to test, evaluate, or treat him for damage—including spasms, seizures, and other symptoms—that Belk believes were caused by a stroke he suffered before his detention and possible later strokes

during his detention.  His symptoms have increased since his detention.  In Count 3, Belk alleges that Dr. Larson refused to authorize outpatient physical and occupational therapy ("PT/OT") sessions recommended by therapists, and that Dr. Larson and Collins, a captain at the Jail, denied Belk access to therapeutic aids to help his symptoms.  He asserts that in so acting, Dr. Larson and Collins violated his Fourteenth Amendment due process rights.

The Court will grant summary judgment for Collins based on qualified immunity.  As for Dr. Larson, a reasonable jury could find he failed to adequately test, evaluate, and treat Belk's deteriorating physical condition, so that claim will remain for trial.

### I.      Summary Judgment Standard

Summary judgment is appropriate only if the moving party can show "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party has the burden of establishing that no material facts are genuinely disputed.  *Lawrence v. Kenosha Cty.*, 391 F.3d 837, 841 (7th Cir. 2004).  Any doubt about the existence of a genuine issue must be resolved in favor of the nonmoving party.  *Id*.

When presented with a motion for summary judgment, the Court does not decide the truth of the matters presented, and it cannot "choose between competing inferences or balance the relative weight of conflicting evidence."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Hansen v. Fincantieri Marine Grp.,* 763 F.3d 832, 836 (7th Cir. 2014).

Once a properly supported motion for summary judgment is filed, the adverse party "must set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 250 (internal quotations omitted).  The Court must then "view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the

non-moving party." *Hansen*, 763 F.3d at 836 (internal quotations omitted).  If the "evidence is such that a reasonable jury could return a verdict for the nonmoving party[,]" then a genuine dispute of material fact exists.  *Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016) (internal quotations omitted).

## II.     Dr. Larson's Motion for Summary Judgment (Doc. 277)

In his motion for summary judgment, Dr. Larson does not really contest that Belk had an objectively serious medical need, but he argues that no evidence shows his response to that need was objectively unreasonable or that it caused Belk any harm.  Belk maintains Dr. Larson refused to test, evaluate, or treat him as recommended by outside specialists with assistive aids and PT/OT.  He claims this conduct was objectively unreasonable in the circumstances.

### A.     Relevant Facts

The following facts are offered by the parties in their summary judgment materials with respect to Belk's claims against Dr. Larson.  To the extent any facts are disputed, they are presented in the light most favorable to Belk.

In June 2017, long before Belk was arrested and booked into the Jail, he had a stroke (also called a cerebral vascular accident or "CVA") on the left side of his brain.  The CVA caused him a number of physical problems, especially on the right side of his body.  He was prescribed a toe cushion that he wore every day to prevent the toes on his right foot from curling under and causing him to lean to the right, a side effect of the CVA.  He was also prescribed a plastic ankle guard to use as needed to support his right ankle and prevent it from turning outward, another side effect of the CVA.  He regularly used these orthotic/therapeutic devices. He was also prescribed daily blood pressure medicine—hydrochlorothiazide 50 mg and losartan 100 mg daily—and participated in a month of intensive inpatient PT/OT and three months of

outpatient PT/OT after his CVA.

Belk's recovery from the CVA was remarkable; he was able to recover his speech, motor function, and mobility. He was able to jog, get a commercial driver's license, and start a construction business where he performed physical labor. In January 2019, Belk's primary care doctor found he had normal range of motion, normal gait, and no edema, tenderness, or deformity. Continuing to exercise was important to assist his continued recovery.

When Belk entered the Jail on February 8, 2019, he was wearing his toe cushion but not his ankle guard. The toe cushion was taken from him but not reported on the record of his property. During the booking process Belk's blood pressure was slightly elevated (138/88), and Belk reported a history of hypertension and stroke. Two days later, a nurse assessed Belk's health, and he informed her of the medication he was taking for his blood pressure. The following day, the nurse verified the prescriptions, and Dr. Larson began prescribing them for Belk. In the Jail, Belk was only allowed recreational time one day a week, and often he did not have space to perform physical exercises like he used to do before he was detained.

Belk had concerns relating to stroke and blood pressure because his physical condition noticeably worsened by May 2019 with new symptoms. Specifically, he began limping, had difficulty sitting down and standing up, and he had trouble moving his right arm. Belk attributed some of the health problems he experienced in the Jail—headaches, tingling on the back of his head, upper extremity spasms multiple times day, right knee and ankle pain; right ankle turned out; numbness, tingling, and tightness in his upper and lower extremities; transient ischemic attacks ("TIAs")—to additional strokes he believes he suffered while detained. He became upset that Dr. Larson did not send him to a hospital outside the prison for his stroke symptoms.

Belk saw Jail nurses multiple times and Dr. Larson at least thirteen times in less than a

year.  The visits with Dr. Larson are summarized below:

- March 13, 2019:  Belk complained of coldness in his right arm and painful spasms.  He also had a high blood pressure reading and asked to be sent to a doctor—specifically, a neurologist—outside the prison.  He also asked for his toe cushion and ankle guard.  Dr. Larson discussed hypertension with Belk and ordered his blood pressure to be checked twice a week for three weeks and to come in for a follow-up visit after that.  He did not obtain a toe cushion or ankle guard for Belk because he said the ankle guard posed a security risk.

- May 2, 2019:  Belk complained he had suffered one or two mini-strokes during his detention, he was limping, his right fingers were numb, his right foot was turning out, and he had a high blood pressure reading.  Dr. Larson assessed Belk's range of motion, ordered lab tests, added a new blood pressure medication (clonidine), ordered daily blood pressure checks for a week, and ordered a follow-up visit after that.  Belk again asked for orthotics, and Dr. Larson said he would ask about them.

- May 5, 2019:  Belk complained of left neck and arm swelling that he attributed to the clonidine, but his blood pressure was stable.  Dr. Larson discontinued the clonidine.

- May 9, 2019:  Belk complained that his right side was tight, he had tingling in his left fourth and fifth fingers, and his blood pressure had gone up.  Dr. Larson said the symptoms were probably local and would go away, discussed blood pressure medication with Belk, adjusted his medication, ordered blood pressure checks for three weeks, and ordered lab work in three weeks.

- June 2, 2019:  Dr. Larson discussed blood pressure medication with Belk, adjusted his medication, ordered blood pressure checks twice a week for three weeks, and ordered a follow-up visit in three weeks.

- June 4, 2019:  Dr. Larson encouraged Belk to exercise as able to lose weight.

- August 4, 2019:  Belk complained that his right arm was getting worse from strokes he suffered in the Jail, his ligaments and tendons were getting hard, his head was hurting and tingling in the back, he was having spasms twice a day, and his right knee and ankle were the same.  Dr. Larson offered Belk amlodipine (a blood pressure medicine), encouraged range of motion exercises and weight loss, ordered blood pressure checks twice a week for three weeks, and ordered a follow-up visit.

- August 11, 2019:  Belk's blood pressure readings were elevated and he complained of tingling on his head, tight right elbow, left heel numbness, left fourth and fifth finger numbness, right arm tingling and tight, right hand tight, right knee pain, right ankle turned out, inability to stand straight, spasms in upper right arm, and suspected TIAs.  Dr. Larson assessed Belk's range of motion, again offered Belk amlodipine, and referred Belk to the neurologist who treated his 2017 stroke, Dr. Alexandre Carter.

5

Belk saw Dr. Carter on October 11, 2019. He complained of worsening symptoms on his right side, curling of his right toes, slurred speech, right eye sensitivity, and right side spasms. Belk's physical condition was much worse than it was after his post-stoke recovery and before he entered the Jail. Dr. Carter found that Belk was suffering symptoms that could be expected after his 2017 stroke, but he could not rule out new strokes causing those symptoms as well. He recommended adding some medications to Belk's regimen along with outpatient PT/OT, a CT scan of the brain, and a follow-up visit.

Within days of Belk's appointment with Dr. Carter, Dr. Larson prescribed the new medications recommended by Dr. Carter for blood pressure, spasms, and pain; ordered a follow-up appointment with Dr. Carter; and ordered continuing regular monitoring of Belk's blood pressure. The medication provided Belk some relief from the spasms and pain. Dr. Larson did not order PT/OT. Dr. Carter did not provide, and Dr. Larson did not ask him about, specific recommendations for the areas needing therapy. Dr. Larson continued to tweak Belk's blood pressure medication depending on his readings.

Dr. Larson continued to see Belk:

- November 4, 2019: Belk's blood pressure readings were elevated. Dr. Larson adjusted his medication.

- November 15, 2019: Belk's blood pressure readings were normal and stable, although he complained of tingling on the top of his head, increasing pain, breathing issues, and swelling in his upper body and legs. The frequency of Belk's spasms was reduced, but he still suffered from them. Dr. Larson ordered a chest x-ray, an EKG, lab tests, and a follow-up in one week.

- November 24, 2019: Belk complained of tingling on the top of his head and increased pain. Dr. Larson found his blood pressure stable and ordered a follow-up appointment in one month.

- December 19, 2019: Belk complained that he was not getting PT/OT, his right upper extremity was inflexible and tight, and his right toes were curling. Dr. Larson noted Belk's right arm was tight, and his right hand flexion and extension were fair. Dr. Larson

said he would get specific PT/OT recommendations from Dr. Carter and refer Belk for therapy.  He also ordered a CT scan and a PT/OT evaluation.

- January 2, 2020:  Belk complained of head tingling and blurry vision.  Dr. Larson offered to add a new medication (low-dose aspirin) but Belk declined the change.  Dr. Larson noted Belk had a CT scan and a PT/OT evaluation scheduled.

Belk received the PT/OT evaluation on January 31, 2020.  The PT evaluator recommended outpatient PT and general exercises for Belk's lower extremities with stretching through a home exercise program ("HEP").  The PT therapist developed a treatment plan of a short period of PT to make sure Belk was properly performing the HEP.  He also gave Belk a squeeze ball to use in his HEP.  The OT evaluator found limitations in Belk's right upper extremity and recommended outpatient OT visits twice a week for four weeks.  The PT/OT evaluators agreed the PT/OT would benefit Belk and was required to care for him.

Dr. Larson stopped working at the Jail in January or February 2020 and was replaced by another doctor.  Throughout the time Belk was under Dr. Larson's care, Dr. Larson's biggest concern with Belk was to bring Belk's blood pressure under control to lower the risk of a stroke, although he was also aware of the importance of rehabilitation services to stroke recovery.  To this end, Dr. Larson ordered nurses to monitor Belk's blood pressure frequently and continued to prescribe and adjust medications for him.  Nurses did not always take Belk's blood pressure as often as Dr. Larson ordered, and on occasion it took some time to get Belk's medication to him after Dr. Larson ordered it.

All in all, Dr. Larson assessed and treated Belk for some of his concerns, including examining him, testing his range of motion, ordering blood tests and frequent blood pressure monitoring (although they did not occur as frequently as Belk would have liked), and adjusting his medication based on Belk's blood pressure readings (although on occasion Belk declined recommended changes).  He also encouraged Belk to exercise, lose weight, and reduce his salt

7

intake to help lower his blood pressure. Dr. Larson did not reflect in his notes that Belk wanted orthopedic or therapeutic aids like a toe cushion and ankle guard, and he does not remember any such requests, although Belk claims he asked for a toe cushion every time he saw Dr. Larson and told Dr. Larson where he could get one. Belk also complained to him on several visits about his right foot turning outward and/or his right toes curling under. Dr. Larson refused to procure a toe cushion or ankle guard for Belk, saying they posed security risks.

Dr. Carter saw Belk again on July 10, 2020, several months after Dr. Larson's departure from the Jail. He noted that a CT scan of Belk's head was unremarkable and showed no new stroke. Dr. Carter noted ongoing, and sometimes worsening, symptoms on Belk's right side, and noted Belk's report that his physical rehabilitation order was downgraded to non-specific exercise. In October 2020, Dr. Carter noted that Belk's symptoms were out of proportion to his 2017 stroke but that imaging did not show any conclusive evidence of a new stroke. Dr. Carter again ordered PT to be conducted at the Jail. Belk received more detailed instruction on an HEP in a PT/OT visit in July 2020.

Belk continues to suffer from post-stroke symptoms that he attributes to Dr. Larson's allegedly inadequate medical care, including the failure to provide orthotics and PT/OT and the delay in sending him to Dr. Carter. Now, Belk's right foot is turned outward to the right, which causes his knee to turn to the right as well as pain in his hip and back, and four toes on his right foot are curled under, causing his large toe to become bruised. He does not have nearly the physical abilities he had when he entered the Jail in early 2019.

B. <u>Legal Standard</u>

Belk's claim is governed by the reasonable objectiveness standard. Relying on the Supreme Court's decision in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), the Seventh Circuit

Court of Appeals holds that the objective reasonableness standard applies to all Fourteenth Amendment conditions of confinement claims brought by pretrial detainees. *Hardeman v. Curran*, 933 F.3d 816, 823 (7th Cir. 2019). This includes claims of inadequate medical care. *James v. Hale*, 959 F.3d 307, 318 (7th Cir. 2020); *Miranda v. Cty. of Lake*, 900 F.3d 335, 352 (7th Cir. 2018). The controlling inquiry in the medical context consists of two steps. The first step focuses on the intentionality of the defendant's conduct and asks "whether the medical defendant[] acted purposefully, knowingly, or perhaps even recklessly when [he] considered the consequences of [his] handling of [plaintiff's] case." *See Miranda*, 900 F.3d at 353. The second step asks whether the challenged conduct was objectively reasonable based on the totality of the circumstance faced by the defendant. *Id*. at 354.

    C.    <u>Discussion</u>

The evidence shows that throughout Belk's stay at the Jail his physical condition deteriorated from either a resurgence of post-CVA symptoms or additional strokes causing new and/or worse symptoms. The remarkable post-CVA rehabilitative state he had achieved before entering the Jail dissipated during his first year in the Jail when he was under Dr. Larson's care.

With respect to Dr. Larson's efforts to avoid stroke by controlling Belk's blood pressure, the evidence shows that he acted purposefully, knowingly, and objectively reasonably. When Belk arrived at the Jail, the day Larson received verification that Belk had been taking blood pressure medicine, he ordered that the same medicine be given to him in the Jail. Throughout Belk's tenure at the Jail under Dr. Larson's care, Dr. Larson advised Belk about hypertension and ordered medical staff to monitor Belk's blood pressure on a regular basis. That the monitoring was not done as frequently as ordered is the fault of other medical staff, not Dr. Larson, who ordered reasonable monitoring. Dr. Larson also adjusted Belk's medication based

on his blood pressure readings and his own medical judgment about appropriate treatment to bring Belk's blood pressure under control without deleterious side effects. Indeed, it appears he was successful; Belk's blood pressure appeared to be normal and stable by November 2019. No reasonable jury could find Dr. Larson's treatment of Belk's blood pressure was unreasonable, and any claim based on that theory cannot survive.

Dr. Larson's response to the degeneration of Belk's physical condition is another story. Belk was a stroke survivor who had made remarkable progress before entering the Jail, but he began noticeably losing ground in his recovery by May 2019, about three months after he entered the Jail. Dr. Larson treated Belk's symptoms as a blood pressure problem—and as noted above, treated that problem reasonably and successfully—but he failed to appreciate Belk's separate medical need for care for his reemerging and debilitating post-CVA symptoms. He knew those symptoms included curling toes, right ankle turning out, musculoskeletal problems on Belk's right side, spasms, and head pain and tingling, yet he did little, if anything, to address those problems considering the potential consequences.

There is no evidence in the record of any legitimate reason for Dr. Larson not to obtain—or at least try to obtain—the orthotic devices Belk claims he used *specifically to address the problems he was redeveloping in the Jail*—curling toes and outward pointing foot. And viewing the evidence in Belk's favor, the Court must accept that he made such requests every time he saw Dr. Larson, and Dr. Larson did nothing in response.

And it is true Dr. Larson referred Belk to Dr. Carter in August 2019. However, although Dr. Larson immediately implemented the medication changes recommended by Dr. Carter, he did not order PT/OT until two months later. Larson claims he was waiting for Dr. Carter's office to write a prescription for the PT/OT showing the areas of Belk's body that needed therapy, but

10

when that prescription did not arrive, he went ahead and referred Belk for a PT/OT evaluation without a prescription from Dr. Carter.  Larson does not explain why he did not consider some kind of therapy or exercise during the summer of 2019 when it was clear Belk's physical condition was deteriorating or, at the very least, sooner after Dr. Carder recommended it.  Very soon after the PT/OT evaluation, Dr. Larson stopped working at the Jail, so he cannot reasonably be held accountable for what was done with the PT/OT evaluation after he left.

A reasonable jury could find that the failure or delay in testing, evaluating, and treating Belk by providing medication, orthotic devices, and PT/OT for Belk's post-CVA symptoms was purposeful and unreasonable in the circumstances.  A reasonable jury could also find that the delay in appreciating, evaluating, and treating Belk's medical needs beyond mere blood pressure control caused his physical problems to worsen to their current state.

Dr. Larson also suggests that, even if a reasonable jury could find against him, the Court should grant him summary judgment on Belk's claims based on the lack of PT/OT because it was not specifically identified in the Court's prior orders.  Thus, Dr. Larson believes no such claims are in this case.  It is true that Belk did not specifically mention PT/OT until his Second Amended Complaint (Doc. 143), when he first mentions in it Counts 2 and 3, and the Court did not specifically mention PT/OT in its order screening the First Amended Complaint (Doc. 50) or its ruling on the failure to exhaust defense (Doc. 261).  However, a quick look at all the amended complaints in this case shows that Belk has been complaining of lack of treatment for his stroke symptoms since late 2019 and lack of PT/OT specifically since early 2020.  Furthermore, in Belk's August 7, 2019, captain's complaint, he complains that Dr. Larson "does nothing" (Doc. 162-2 at 6).  The claim for lack of treatment can be reasonably read into Counts 2 and 3. Furthermore, as noted above, a reasonable jury could find Dr. Larson was unreasonable in failing

11

to order, or delaying in ordering, some kind of assessment *and treatment* for Belk's worsening stroke symptoms.

For these reasons, Dr. Larson is not entitled to summary judgment on Counts 2 or 3 for the failure to test, evaluate, and treat Belk's stroke-related damage (including providing therapeutic aids and PT/OT), although he is entitled to summary judgment on any claims for inadequate hypertension evaluation and treatment.

### III. Captain Collins's Motion for Summary Judgment (Doc. 276)

In his motion for summary judgment on Count 3, Collins argues that he was permitted to rely on medical professionals to tend to Belk's medical needs and that no reasonable jury could find he unreasonably interfered with medical personnel's caring for those needs, including the provision of orthotics or PT/OT. He further notes he was not connected with the confiscation of Belk's toe cushion on his intake or the failure to have it, or any other toe cushion, given to him later. Collins also asserts Belk cannot show he suffered any physical injury from any of conduct by Collins. Finally, he asserts he is entitled to qualified immunity.

To the extent Collins takes issue with the Court's denial of summary judgment on Count 3 on the grounds of failure to exhaust administrative remedies, he should have raised that objection promptly after the Court made that ruling on June 4, 2021 (Doc. 261). Collins is also incorrect that the order pertained to the claims as alleged in the First Amended Complaint. By that the time of the order, the Third Amended Complaint (Doc. 178), including its express allegations regarding PT/OT, had superseded the First Amended Complaint as the operative pleading in the case. *See Johnson v. Dossey*, 515 F.3d 778, 780 (7th Cir. 2008); *Massey v. Helman*, 196 F.3d 727, 735 (7th Cir. 1999). The Court acknowledged as much in footnote 2 of the order. The Third Amended Complaint made specific allegations in Count 3 about the failure

12

to receive outpatient PT/OT, so that aspect of Count 3 remains pending.

    A.    <u>Relevant Facts</u>

With respect to Belk's claims against Collins, the following relevant facts are offered in addition to those listed in connection with Dr. Larson's motion. To the extent any facts are disputed, they are presented in the light most favorable to Belk.

Perhaps Collins's closest direct involvement with Belk's health care needs was on May 7, 2019, when he escorted Belk to sick call. Collins noticed Belk was not walking right, and Belk told him it was because he did not have the foot orthotic (the toe cushion) he needed and that it had been taken from him when he was booked into the Jail. Collins told Belk he would see what he could do, but Belk never got the toe cushion. Later Collins told Belk he has talked with the booking officer but could not remember what he had said about the toe cushion.

Belk's captain's complaints of August 7 and 11, 2019 (Docs. 162-2 at 6-8), were addressed to and received by Captain Collins. In the August 7, 2019, complaint, Belk raised the issue of not having his prosthetic devices, his worsening stroke symptoms, and that Dr. Larson "did nothing" to help him. He asked to see a neurologist. Collins contacted the Jail's health care unit about the complaint, the people he believes were in the best position to address medical complaints, and the following day a nurse responded addressing Belk's complaints. Specifically, she indicated if Belk's family had his needed prosthetics, they could bring them to the Jail. Belk never received that response until he received it in discovery in this case.

In the August 11, 2019, captain's complaint, Belk again complained about Dr. Larson's lack of response to his worsening stoke symptoms. Belk indicated Dr. Larson said he needed to get Belk's medical records from Dr. Carter before he could make a referral, and asked Belk to sign a release that would allow Dr. Larson to get them. After consulting the Jail's medical staff,

13

Captain Collins responded to Belk that the outside referral was in process.

Belk made numerous other written and oral complaints to Collins about his medical care. Collins routinely referred Belk to the medical staff for medical issues rather than making an independent decision to send Belk to an outside provider. In October 2021, Collins told Belk to stop filing complaints because he would not answer them anymore.

The Jail's healthcare staff was responsible for diagnosing detainees' medical problems and determining the course of treatment. Correctional staff was not involved in those decisions, although correctional officers might be consulted where security could be at risk because of a treatment. For example, where medical staff prescribed an orthotic device for a detainee that could be used as a weapon, security staff would assess its dangerousness. Collins never inspected either the toe cushion or ankle guard Belk said he needed and was not responsible for Belk's not getting them. In fact, Collins did not communicate with Dr. Larson at all about Belk's healthcare needs, including whether the therapy, therapeutic aids, or orthotics he requested posed security risks. There is no admissible evidence suggesting Collins communicated with Dr. Marcowitz or Dr. Shah, Dr. Larson's successors, about Belk either.

Further, although he did not always respond to Belk's captain's complaints, Collins did not prevent or impede Belk from seeing the Jail medical staff hundreds of times on sick calls, seeing a Jail doctor 30 times, attending off-site medical appointments 6 times, and using available space for exercises at least 78 times. Collins was also not involved in any decision to downgrade the recommendation for PT/OT to general exercise.

   B. <u>Legal Standard</u>

Like Dr. Larson, Collins is subject to the Fourteenth Amendment Due Process Clause's objective reasonableness standard since Belk was a pretrial detainee. *See Hardeman v. Curran*,

933 F.3d 816, 823 (7th Cir. 2019); *McGee v. Parsano*, 55 F.4th 563, 569 (7th Cir. 2022).  Under this standard, the plaintiff must prove the defendant's challenged conduct was objectively unreasonable without regard to the defendant's subjective state of mind.  *McGee*, 55 F.4th at 569.

Where the detainee has sued a non-medical defendant for inadequate medical care, the Court recognizes the circumstances are different from when the detainee sues a medical defendant.  This is because jails and other correctional facilities often separate the responsibilities of medical professionals to provide inmate healthcare from those of other security or administrative staff to keep the institution secure and in good order.  *Id.*; *Miranda v. Cty. of Lake*, 900 F.3d 335, 343 (7th Cir. 2018).

"When detainees are under the care of medical experts, non-medical jail staff may generally trust the professionals to provide appropriate medical attention," *Miranda*, 900 F.3d at 343, and may "defer to the professional medical judgments of the physicians and nurses treating the [inmate] in their care without fear of liability for doing so," *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010).  This is so unless the non-medical officer "had reason to know that their medical staff were failing to treat or inadequately treating an inmate."  *Miranda*, 900 F.3d at 343. "This remains true even when an inmate is in obvious distress and even when the medical staff has misdiagnosed an inmate—or worse, accused him of faking a very real illness."  *McGee*, 55 F.4th at 573 (*Miranda*, 900 F.3d at 343).  And even if this exception applies, the officer may still be entitled to qualified immunity where it was not clearly established that a reasonable officer would know that his conduct under the particular circumstances violated the constitution. *McGee*, 55 F.4th at 570.

Qualified immunity is an affirmative defense that shields government officials from

liability for civil damages where their conduct does not violate clearly established statutory or constitutional rights of which a reasonable officer would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Denius v. Dunlap*, 209 F.3d 944, 950 (7th Cir. 2000). The qualified immunity test has two prongs: (1) whether the officer violated a constitutional right, and (2) whether the right at issue was clearly established at the time of the alleged misconduct. *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018); *Pearson*, 555 U.S. at 232; *Wilson v. Layne*, 526 U.S. 603, 609 (1999). The Supreme Court encourages, but does not require, examining the second prong before diving into the merits of the plaintiff's claim where it is not necessary. *Wesby*, 138 S. Ct. at 589 n.7 (quoting *Camreta v. Greene*, 563 U.S. 692, 707 (2011)); *accord McGee*, 55 F.4th at 572. The Court does so here.

Under the second prong, the law at the time of the conduct "must have placed the constitutionality of the officer's conduct beyond debate" such that "every reasonable official would understand that what he is doing is unlawful." *Wesby*, 138 S. Ct. at 589 (internal quotations omitted). It must have been "settled law," that is, it must have been "dictated by controlling authority or a robust consensus of cases of persuasive authority." *Id.* at 589-90 (internal quotations omitted). Generally, this requires a high degree of specificity in the precedent so that every reasonable officer would have been alerted to the law in the particular circumstances. *Id.* And it is incumbent on the plaintiff to establish the clear establishment of the law in the particular circumstances. *Denius*, 209 F.3d at 950.

  C.  <u>Discussion</u>

In the case at bar, in order to deny Collins qualified immunity, it must have been true at the relevant time that "every reasonable officer must have understood that deferring to the judgment of medical staff in these circumstances was unlawful." *McGee*, 55 F.4th at 572. In

fact, the reasonable officer's understanding at that time—as described in the caselaw set forth above—was that he could defer to medical professionals unless there was some obvious indication that the inmate's need was not being handled. Here, in May 2019 Collins clearly knew that Belk's medical needs were being addressed by the Jail's medical staff because *Collins was escorting him to and from the infirmary*. While Collins might have volunteered to help Belk obtain a piece of property he claims was taken from him on intake, Collins was reasonable to assume that any of Belk's medical needs connected to his confiscated property or his irregular walking would be addressed by medical staff.

The same is true for Belk's captain's complaints in August 2019 and later complaining of Dr. Larson's lack of treatment of his stroke symptoms. An infirmary nurse responded that Belk could get his family to bring in his prosthetics and that an appointment with Dr. Carter was in the process of being set up, both of which indicated the medical staff was considering and acting on Belk's needs rather than ignoring them. Belk claims that Collins could not rely on a nurse's response to Belk's August 7 captain's complaint because she was not qualified to respond.

However, the caselaw at the time indicated Collins could defer to medical judgment in how best to handle Belk's health needs, even if Belk did not think the care was sufficient and even if a medical explanation was written down by a nurse rather than a doctor. And nothing in Belk's case would have alerted a reasonable officer that it was unconstitutional to do so in the particular situation. Indeed, Belk has not pointed to "controlling authority or a robust consensus of cases of persuasive authority" with similar or analogous facts that would have alerted a reasonable officer that behaving like Collins did in the particular circumstances he faced was unconstitutional.

For these reasons, the Court finds Collins is entitle to qualified immunity and will

therefore grant summary judgment in his favor.

## IV. Conclusion

For the foregoing reasons, the Court:

- **GRANTS in part** and **DENIES in part** Larson's motion for summary judgment (Doc. 277).  The motion is **GRANTED** to the extent Belk might be asserting claims based on inadequate hypertension evaluation and treatment and **DENIED** to the extent Belk asserts claims of inadequate testing, evaluation, and treatment of Belk's stroke-related damage (including providing therapeutic aids and PT/OT);

- **GRANTS** Collins's motion for summary judgment on qualified immunity grounds (Doc. 276); and

- **DIRECTS** the Clerk of Court to enter judgment accordingly at the close of the case.

By separate order, the Court will set a telephone status conference to select dates for the

Final Pretrial Conference and Trial.

**IT IS SO ORDERED.**
**DATED:  May 4, 2023**

                                                s/ J. Phil Gilbert
                                                **J. PHIL GILBERT**
                                                **DISTRICT JUDGE**