UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CAMERON BELK, SR., <br><br> Plaintiff, <br><br> v. <br><br> ARAMARK CORRECTIONAL SERVICES, LLC, MICHAEL BUJNAK, SHAN COLLINS, RHONDA DUBOSE, TAMMY GRIME, DEBORAH HALE, DENNIS P. LARSON, JANICE MCCARRON, DELANCEY MOORE, MELODY MURRY, MARY ROBINSON-DAVIS, RICHARD WATSON, and WEXFORD HEALTH CARE SOURCES, INC., <br><br> Defendants. | Case No. 19-cv-499-JPG |

## MEMORANDUM AND ORDER

This matter comes before the Court on defendant Dr. Dennis P. Larson's motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b) or, in the alternative, for a new trial pursuant to Federal Rule of Civil Procedure 59 (Doc. 349). Plaintiff Cameron Belk, Sr. has responded to the motion (Doc. 357), and Dr. Larson has replied to that response (Doc. 360). To the extent Dr. Larson's reply raises new arguments not raised in his original motion, the Court disregards them. *Wright v. United States*, 139 F.3d 551, 553 (7th Cir. 1998).

This case was tried to a jury in October 2023 on the question of whether Dr. Larson's medical care for Belk, a pretrial detainee at the St. Clair County Jail ("Jail"), was purposeful and objectively unreasonable and therefore in violation of Belk's Fourteenth Amendment due process rights. Specifically, Belk suffered a stroke in 2017, and the jury was asked to determine whether Dr. Larson's failure to provide testing, evaluation, and treatment for stroke-related

damage and his failure to provide therapeutic aids and physical/occupational therapy was purposeful and objectively unreasonable in light of Belk's medical needs, and whether Dr. Larson's conduct caused Belk any harm.

At the close of the evidence, Dr. Larson argued that the evidence did not support a finding of objective unreasonableness or that Dr. Larson's conduct caused Belk to suffer any harm. The Court denied Dr. Larson's motion for judgment as a matter of law pursuant to Rule 50(a). The jury then returned a verdict against Dr. Larson in the amount of $32,000 in compensatory damages (Doc. 328), and the Court entered a written judgment the following day (Doc. 335). Dr. Larson now renews his motion for judgment as a matter of law as permitted by Rule 50(b). He also seeks a new trial under Rule 59 because he believes the Court made erroneous and prejudicial evidentiary rulings and because the verdict was against the manifest weight of the evidence. He also argues that the compensatory damages were excessive and not rationally connected to the evidence.

The Court will discuss the trial proceedings as necessary in connection with Dr. Larson's specific complaints.

## I.     Motion for Judgment as a Matter of Law

The Court may grant judgment as a matter of law during trial if "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). If the Court denies the motion, the moving party may renew it after entry of judgment on the verdict. Fed. R. Civ. P. 50(b). In response to a post-verdict motion under Rule 50(b), the Court may allow the judgment to stand, order a new trial, or direct entry of judgment as a matter of law. Fed. R. Civ. P. 50(b)(1)-(3).

Rule 50 imposes a "high bar." *Ruiz-Cortez v. City of Chi.*, 931 F.3d 592, 601 (7th Cir. 2019). In deciding the motion, the Court should consider all of the evidence, but must draw all reasonable inferences in favor of the non-moving party and must not make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Hakim v. Safariland, LLC*, 79 F.4th 861, 868 (7th Cir. 2023). "That is, the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *Reeves*, 530 U.S.. at 151 (quoting 9A C. Wright & A. Miller, *Federal Practice and Procedure* § 2529, at 300 (2d ed. 1995)). This standard mirrors the standard for granting summary judgment. *Reeves*, 530 U.S. at 150 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986)); *Murray v. Chi. Transit Auth.*, 252 F.3d 880, 887 (7th Cir. 2001).

    A.    <u>Objectively Unreasonable Conduct</u>

Dr. Larson argued that there was insufficient evidence for a jury to conclude that his conduct was objectively unreasonable or to support the specific damage award chosen by the jury. Dr. Larson points to evidence that he provided medical care to Belk from February 2019 to January 2020 during which he saw Belk at least thirteen times, all of which were explained to the jury by Dr. Larson himself and were supported by the medical records. In each visit, Dr. Larson exercised his medical judgment to care for Belk, including providing medications, referrals to outside practitioners, physical/occupational therapy, instructing Belk to continue to do the exercises he had learned in 2017 after his stroke, and more. Dr. Larson contends that Belk's testimony about the treatment provided was simply a disagreement about the course of treatment chosen by Dr. Larson in his medical judgment, not enough to show a constitutional violation.

Belk also points to evidence of his condition before entering the Jail, testimony from himself and Tyler Cain, a fellow inmate, about his visible decline in physical condition during his first few months in the Jail, as well as his own testimony about his complaints to Dr. Larson of pain.  Belk testified that he reported his deterioration and pain to Dr. Larson in May 2019 and several times thereafter.

The evidence, viewed in Belk's favor, showed Dr. Larson was largely indifferent to Belk's medical history and physical deterioration, which was manifested by unreasonable months-long delays in assessment and treatment.  Belk is not asserting that Dr. Larson's response was inadequate because it was not to order the exact treatment Belk had received immediately post-stroke in 2017, but that it was inadequate because Dr. Larson failed to even inquire into and treat Belk's newly-developing symptoms.  It is possible that the evidence could support a jury verdict that Larson purposefully or recklessly failed to take the steps that a reasonable doctor would have taken in the same situation and that the care that Dr. Larson provided was objectively unreasonable considering Belk's symptoms of pain and physical deterioration.

  B.  <u>Causation of Harm</u>

Dr. Larson also challenges the sufficiency of the medical evidence to show Belk suffered any harm because of Dr. Larson's conduct.  He contends that verifying medical evidence is needed to show such causation of harm.  In support, he points to cases requiring medical evidence verifying that a short delay in treatment—hours-long—caused harm, *Langston v. Peters*, 100 F.3d 1235, 1240 (7th Cir. 1996) (one-hour delay not deliberate indifference); *Roberts v. Neal*, No. 11-cv-266-SMY-PMF, 2016 WL 4267988 (S.D. Ill. Aug. 15, 2016) (4- to 5-hour delay not deliberate indifference), *aff'd*, 713 F. App'x 509 (7th Cir. 2018), and to other caselaw acknowledging the need for medically certain evidence where damages for future harm are

4

sought, *Henderson v. Sheahan*, 196 F.3d 839, 848-49 (7th Cir. 1999) (need for medical evidence to support award for future harm from cigarette smoke). In fact, he notes that Belk's physical therapist could not opine whether Belk's worsening symptoms were caused by the lack of skilled occupational therapy.

Belk argues that "verifying medical evidence" does not need to be in the form of expert testimony but can consist of medical records or even other non-expert evidence from which a factfinder could reasonably infer causation of harm. *Jackson v. Sheriff of Winnebago Cnty.*, 74 F.4th 496, 501 (7th Cir.), *reh'g denied*, 2023 WL 5337443 (7th Cir. Aug. 18, 2023). Belk points to the common-sense conclusion that the testing and treatments that helped him immediately post-stroke—including physical/occupational therapy—would also have helped him when those same symptoms redeveloped in the Jail. Indeed, the occupational therapist reported that Belk would be helped by physical/occupational therapy and that it might have prevented his earlier deterioration in the Jail.

This evidence viewed in Belk's favor could lead a reasonable jury to conclude that the months-long delay in obtaining physical/occupational therapy and other prior successful treatments caused Belk to suffer pain and declining physical condition in the interim. Based on Belk's prior response to physical/occupational therapy and therapeutic aids like a toe cushion, a reasonable jury could conclude that the failure to provide these treatments earlier caused Belk to unnecessarily suffer.

    C.    <u>Manifest Weight of the Evidence</u>

Dr. Larson argues that, all in all, the jury's verdict was against the manifest weight of the evidence. Belk notes that this is a new ground that Dr. Larson did not advance in his motion for judgment as a matter of law during the trial.

Belk is correct that a party may not raise an issue for the first time in a post-trial motion for judgment as a matter of law. Dr. Larson did not argue in his Rule 50(a) motion made during trial that the manifest weight of the evidence justified judgment in his favor. *Sunny Handicraft (H.K.) Ltd. v. Envision This! LLC*, 66 F.4th 1094, 1098 (7th Cir. 2023) (citing *Builders NAB LLC v. FDIC*, 922 F.3d 775, 778 (7th Cir. 2019); *Wheeler v. Hronopoulos*, 891 F.3d 1072 (7th Cir. 2018)). It might be true that Dr. Larson may be considered to have raised the argument because it is supported by the evidence he cited regarding unreasonableness and causation. Nevertheless, the foregoing discussions make clear that the judgment was not against the manifest weight of the evidence.

### D. Compensatory Damages

Dr. Larson complains that the compensatory damage award of $32,000 was excessive and not rationally related to the evidence. Belk counters that Dr. Larson has not supported his bare allegation with argument or legal support. He also notes that he raises this argument for the first time in his post-judgment motion.

While the Court is aware that Dr. Larson could not have raised this argument before the verdict was entered, it agrees with Belk that it is unsupported by legal argument and is therefore waived. *See Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012) (arguments that are "underdeveloped, conclusory, or unsupported by law" are waived).

For the foregoing reasons, the Court declines to enter judgment as a matter of law in Dr. Larson's favor and will let the judgment stand.

### II. Motion for a New Trial

Rule 59(a)(1)(A) allows the Court to grant a new jury trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." This includes where

the verdict is against the manifest weight of the evidence or the trial was unfair to the moving party. *Venson v. Altamirano*, 749 F.3d 641, 657 (7th Cir. 2014); *Kapelanski v. Johnson*, 390 F.3d 525, 530 (7th Cir. 2004). A verdict is against the manifest weight of the evidence only if, viewing the evidence in favor of the non-moving party, no rational jury could have rendered the verdict. *Hakim v. Safariland, LLC*, 79 F.4th 861, 868 (7th Cir. 2023); *EEOC v. AutoZone, Inc.*, 809 F.3d 916, 919 (7th Cir. 2016).

      A.      <u>Erroneously Admitted Evidence</u>

Dr. Larson argues that the Court erroneously admitted evidence that was impermissibly prejudicial to him. Evidentiary errors, considered alone or cumulatively, will be a basis for a new trial only if the errors had a substantial influence over the jury and the result was unjust, that is, where there is a significant chance that the wrongly introduced evidence affected the outcome of the trial. *Jordan v. Binns*, 712 F.3d 1123, 1137 (7th Cir. 2013); *E.E.O.C. v. Mgmt. Hosp. of Racine, Inc.*, 666 F.3d 422, 440 (7th Cir. 2012); *Farfaras v. Citizens Bank & Tr. of Chi.*, 433 F.3d 558, 564 (7th Cir. 2006); *see* Fed. R. Civ. P. 61 ("Unless justice requires otherwise, no error in admitting evidence . . . is grounds for granting a new trial. . . .").

      1.      <u>Leading Questions</u>

Dr. Larson points generally to the Court's allowing leading questions posed by Belk's counsel on direct examination of Belk's own witnesses who were not considered adverse or hostile. Leading questions on direct examination are prohibited unless they are to develop the witness's testimony or are asked of a hostile or adverse witness. Fed. R. Evid. 611(c). Dr. Larson, however, fails to support his general allegation with any citation to specific leading questions—or even to specific witnesses' testimony—that was procured by leading questions and had a significant chance of affecting the outcome of the trial.

In response, Belk notes that objections to admission of evidence must be preserved for post-judgment motions by objecting when the evidence is offered. He asserts that since Dr. Larson only objected twice in trial about leading questions, his objections are waived except for those two instances. Belk points to the two instances where Dr. Larson objected on the basis of a leading question—the testimony of Dr. Ellerby, Belk's primary care doctor, describing common side effects of stroke, and the testimony of correctional Captain Shan Collins that inmates would sometimes block areas between bunks. He claims the testimony was authorized by Federal Rule of Evidence 611(c) and, in any case, that any error was harmless under Federal Rule of Civil Procedure 61.

Belk is correct that an objection not made during the trial cannot be made for the first time in a post-judgment motion. As a consequence, the Court concentrates on the two evidentiary objections Dr. Larson made during the trial.

The first was to leading questions posed to Dr. Ellerby to identify certain specific potential consequences of stroke. Dr. Ellerby had just testified, "Some people have physical impediments as far as being able to use a limb, an arm or a leg, those kinds of things," Transcript of Trial ("Tr.") at 17:14-16, and counsel asked leading questions about specific physical impairments. Such leading questions were appropriate to develop her prior testimony about physical impairments generally. *See* Fed. R. Evid. 611(c).

The second objection was to leading questions posed to Captain Collins, who was testifying regarding the space available for an inmate to do exercises in the cellblock when it was overcrowded. Counsel asked the leading question whether there was sometimes no passage between bunks, that is, whether the temporary sleeping "boats" (plastic moveable beds) on the floor obstructed the use of the cellblock. Captain Collins responded that it depended on the

number of boats and where they were.  Tr. 64:9-65:5.  This testimony was appropriate to develop prior testimony about space to exercise in the cellblock.  Furthermore, Captain Collins was a former defendant in the case who could easily have been deemed a witness identified with an adverse party, thus subject to leading question under Fed. R. Evid. 611(c)(2).  His testimony was harmless.

Most importantly, it is the Court's view that even if the leading questions—these and any other that may have been posed by Belk's counsel—had been in error, none of those question, either alone or in combination, substantially influenced the jury such that it would affect the outcome of the trial.  The leading questions allowed counsel to efficiently obtain evidence that would have come out anyway even without the leading questions.  Any error was harmless.

    2. <u>Images of Belk</u>

Dr. Larson claims the Court improperly allowed photographs and videos without foundation or relevance.  He claims that the images, which depicted Belk's physical abilities before entering the Jail in February 2019, were nothing more than an effort to improperly invoke the jury's sympathy for Belk.  *See, e.g., United States v. Adames*, 56 F.3d 737, 746 (7th Cir. 1995) (video of defendant and family opening Christmas presents on irrelevant day properly excluded because designed to garner sympathy).  The images in this case showed Belk holding his baby grandson, Belk at a building site of recreational projects he was helping build for his daughter, Belk with an Olympian athlete at a running event to benefit stroke survivors, Belk sitting in a semi-tractor, Belk performing an exercise, and Belk crossing a run finish line.  At the time of their introduction, the Court acknowledged that they were cumulative but admitted them anyway.

In response, Belk argues that the images he used in his case were relevant and appropriate

9

because they supported Belk's testimony—otherwise almost too good to be true—about his amazing recovery from his 2017 stroke. He also argues that the images helped the jury understand the jargon-filled medical records. He maintains the images showed facts relevant to his case such as the space needed to perform exercises or, for damage assessment purposes, the level of his decline once he reached the Jail or the emotional pain and suffering caused by that decline.

Dr. Larson objected generally to the set of images for lack of foundation and relevance. Tr. 92:5-9. The Court found the images relevant to Belk's physical condition before his detention and allowed the jury to determine their weight, Tr. 92:10-13, but it also acknowledged that some photographs were cumulative, Tr. 96:5-6. Belk responded by making his presentation less cumulative and establishing a foundation for each piece of evidence. Belk's counsel was also careful to ask questions focused on the relevant aspects of the images. For example, for the pictures of Belk with his infant grandson, counsel asked questions about the use of Belk's arms to hold the child, to carry him around, and to get him in or out of a crib before Belk was detained in the Jail. Tr. 92:17-93:13. With respect to pictures of a building project he completed for his daughter, counsel's questions focused on the work Belk did to accomplish the project. Tr. 93:17-95:23.

With respect to the video in particular, Dr. Larson additionally objected to its admission as cumulative and hearsay (the audio and written commentary on the video). Tr. 103:6-14; 105:11-12. The Court allowed the video without the audio comments and instructed the jury to disregard the written comments, which could not be removed from the video. Tr. 105: 13-15; 106:2-3, 6-7; 106:23-107:4. Overall, the Court assessed the evidence during the trial under Federal Rule of Evidence 403, and nothing argued now convinces the Court that it abused its

discretion in finding that, while the images could garner sympathy for Belk, their probative value was not substantially outweighed by that danger. Furthermore, in light of the other evidence in the case, any erroneous admission was harmless.

        3.        <u>Belk's Testimony About Medical Conclusions</u>

Dr. Larson also argued the Court erred by allowing lay witnesses to give expert opinions, specifically, Belk's testimony that he had several strokes while under Dr. Larson's care. He believes this testimony confused the jury about Belk's actual medical condition. He also argues that Belk's testimony about the cause of other medical conditions was wrongly admitted. Belk notes that Dr. Larson did not object when Belk gave testimony of this kind, so he cannot raise the issue now.

Even had Dr. Larson timely objected to preserve the issue, the Court would not order a new trial on this basis. The Court has reviewed Belk's testimony regarding additional strokes in the Jail and finds that it was clear that Belk was not a medical professional offering an expert opinion but was instead a lay-person describing his subjective beliefs about his own physical condition. *See, e.g.,* Tr. 117:16-17 ("I think I had a stroke."); Tr. 119:6-9 ("I believe I have had one to two mini strokes since being in here. I suffered a major stroke on 6/1/2017 so I know the symptoms and aftermath."). It was clear to the jury that Belk was simply giving his personal, nonprofessional opinion of what had happened to him based on his prior stroke experience. To the extent he speculated about the medical causes of his conditions, in light of the other medical evidence in the case such as Dr. Larson's testimony, Tr. 174:6-25 (prior stroke and peripheral symptoms like Belk's did not indicate additional stroke); Tr. 184:8-14 (same); Tr. 180:14-16 ("And he states having strokes while here. But again, I saw no evidence of any stroke. . . ."), it did not confuse the jury, and any erroneous admission was harmless.

        4.        Dr. Carter's Medical Records

Dr. Larson objects to the admission of the records of Dr. Carter, an outside specialist, from July 2020 for the limited purpose of establishing a timeline for an appointment with Dr. Carter. Dr. Larson correctly notes that the evidence is outside the period he was at the Jail. Belk argues that the limited purpose of introducing the medical record was in response to Dr. Larson's counsel's earlier question about when he saw Dr. Carter again.

Although the evidence was outside the relevant time period, Dr. Larson opened the door to the evidence used for the limited purpose of establishing the date of the visit. Tr. 149:15-20. The Court presumes the jury followed the limiting instruction, *see Greer v. Miller*, 483 U.S. 756, 766, n. 8 (1987), which ensured that the evidence was not used improperly.

    B.    Manifest Weight of the Evidence

Finally, Dr. Larson argues that the verdict was against the manifest weight of the evidence. As noted above, a verdict is against the manifest weight of the evidence only if, viewing the evidence in favor of the non-moving party, no rational jury could have rendered the verdict. *Hakim v. Safariland, LLC*, 79 F.4th 861, 868 (7th Cir. 2023); *EEOC v. AutoZone, Inc.*, 809 F.3d 916, 919 (7th Cir. 2016). Belk notes that the argument is not supported by legal argument or citation to facts.

The Court, having presided over this trial and heard all the evidence and having reviewed the transcript in connection with the pending motion, can confidently say, viewing the evidence in Belk's favor, that the jury's verdict had a rational basis and was not against the manifest weight of the evidence and that Dr. Larson received a fair trial.

## III.    Conclusion

For the foregoing reasons, the Court **DENIES** Dr. Larson's motion for judgment as a

matter of law or, in the alternative, a new trial (Doc. 349). The Court will address the pending motions regarding attorney's fees and costs in a separate, forthcoming order.

**IT IS SO ORDERED.**
**DATED:  January 22, 2024**

                                              s/ J. Phil Gilbert
                                              **J. PHIL GILBERT**
                                              **DISTRICT JUDGE**